UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JAMES GOODMAN,

                  Petitioner,

    -against-                                    MEMORANDUM AND ORDER
                                                            18-CV-2769  (ENV)

JAIFA COLLADO,

                  Respondent.
-------------------------------------------------------------X

VITALIANO, District Judge:

      Petitioner James Goodman, proceeding *pro se*,[1] seeks a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his convictions and sentence, entered in Supreme Court, Kings County, for robbery in the first degree and unlawful imprisonment in the second degree. In this petition, Goodman raises several claims:

    (1)    that telephone calls recorded at Rikers Island by the Department of Correction were improperly admitted into evidence at his trial;

    (2)    that there was insufficient evidence to support his convictions;

    (3)    that he was denied the effective assistance of appellate counsel; and

    (4)    actual innocence.

R. 1, at 17–34.[2] For the reasons that follow, the writ is denied and the petition is dismissed.

---

[1] As with all pro se filings, because he is a self-represented party, petitioner is entitled to solicitude. That is, his pro se petition must be liberally construed to raise the strongest arguments it suggests. *Inoa v. Smith*, No. 16-CV-2708, 2018 WL 4110908, at *12 (S.D.N.Y. Aug. 29, 2018) (internal quotation marks omitted). "Pro se status, however, does not exempt a party from compliance with relevant rules of procedural and substantive law." *Id.* (internal quotation marks omitted).

[2] All citations to pages refer to the Electronic Case Filing System ("ECF") pagination. They will be prefaced by a "R."

1

A.     Background[3]

Goodman was convicted by a jury after a trial, which saw the prosecution introduce evidence that included: the testimony of the victim, R. 9-2 at 27–181, the testimony of the victim's friend, who was with the victim at the time of the crimes, R. 9-3 at 1–94, the testimony of a New York City Department of Corrections telecommunications employee responsible for upkeep of the department's phone systems, R. 9-3 at 94–96, audio recordings of calls made by petitioner while he was detained at Rikers Island pre-trial, R. 9-3 at 96–138; the testimony of the lead police investigator, R. 9–3 at 139–200, R. 9-4 at 1–27, and finally, photographic evidence, including a photograph of the lineup in which petitioner was identified by the victim as the assailant, R. 9-4 at 27–28.

These are the facts developed at the trial: On August 23, 2009, at around 5:30 AM, Darien Nesbitt and Brandon Overton exited a cab on Throop Avenue and Fulton Street, in the Bedford Stuyvesant neighborhood of Brooklyn. R. 9-2 at 30–32. The two men began walking towards a bus stop, and on their way, encountered Goodman and another individual, Kasson Brown, as they were passing through the courtyard of a housing development. R. 9-2 at 30, R. 9-3 at 15. Goodman, whom Overton knew from his childhood, said "what's up?" to Overton, introduced himself to Nesbitt by his street name, "L.D.," and suggested that Nesbitt and Overton sit down at a nearby table. R. 9-2 at 30–36. The conversation was interrupted by a side conversation between Brown and Goodman, after which Brown was sent to retrieve "something", R. 9-2 at 37–38, and to return with it. About twenty minutes later, Brown returned with a gun, pointed it at Nesbitt, and demanded that Nesbitt give him his cell phone. R. 9-2 at 38–40; R. 9-3 at 30. Nesbitt handed Brown his phone, and then Goodman directed Nesbitt to take off his sweater and give it to him,

---

[3] Since Goodman was convicted, the facts are recited in the light most favorable to the verdict. *Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012).

which Nesbitt also handed over. R. 9-2 at 42, R. 9-3 at 30. Nesbitt also gave Goodman his identification card, who looked at it and, before returning it, said "now I know where you live at." R. 9-2 at 43, R. 9-3 at 44–45. The four individuals then walked to a nearby store, where Goodman unsuccessfully attempted to sell Nesbitt's phone. R. 9-2 at 52–54. Eventually, Goodman and Brown allowed Nesbitt and Overton to leave, but did not return the items they had stolen from Nesbitt. R. 9-2 at 58. At trial, Nesbitt testified that, before he left, he was told that he better not call the police. R. 9-2 at 58. He didn't. But, when he returned home, Nesbitt told his mother, who reported the incident to the police. R. 9-2 at 59–61. More than a month later, Nesbitt identified Goodman in a lineup as his assailant. R. 9-2 at 61.

Upon conviction, Goodman was sentenced to a term of 12 years imprisonment on the first-degree robbery count, and a concurrent term of one year on the second-degree unlawful imprisonment count, to be followed by five years of post-release supervision. R. 9 at 4. The judgment of conviction was affirmed by the Appellate Division, Second Department, which held that Goodman's claim regarding the insufficiency of the evidence was unpreserved for appellate review, but in any case, found the evidence legally sufficient to support the conviction. *People v. Goodman*, 990 N.Y.S.2d 836 (N.Y. App. Div. 2014). The Second Department also found Goodman's arguments regarding the alleged failure of the State to properly authenticate certain recordings of telephone calls made by Goodman while he was incarcerated to be without merit. *See id.* Finally, it held that several other arguments offered by Goodman were unpreserved for appellate review. On February 5, 2016, leave to appeal to New York's Court of Appeals was denied. *People v Goodman*, No. 2011-023l3, 2016 WL 462220 (N.Y. App. Div. Feb. 5, 2016).

On March 2, 2017, Goodman petitioned the Second Department for a writ of error *coram nobis*, alleging that he was denied the effective assistance of appellate counsel. The Appellate

3

Division denied Goodman *coram nobis* relief by decision and order dated September 17, 2017. *People v. Goodman*, 59 N.Y.S.3d 900 (N.Y. App. Div. 2017). Leave to appeal was denied on December 18, 2017. *People v. Goodman*, 30 N.Y.3d 1060, 94 N.E.3d 492 (N.Y. 2017).

On July 24, 2017, while his *coram nobis* application was pending, Goodman filed a petition in this Court seeking a writ of habeas corpus. Goodman promptly moved to stay the federal habeas proceedings so that he could exhaust his state court remedies. Goodman's motion was denied and his habeas petition was dismissed without prejudice on September 20, 2017. *See Goodman v. Warden*, No. 17-CV-3485-ENV, 2017 WL 4280545 (E.D.N.Y. Sept. 25, 2017).

On May 7, 2018, Goodman filed the instant petition. Days later, on July 25, 2018, Goodman filed a C.P.L § 440.10 motion in the original trial court to vacate his conviction based on a claim of factual innocence. He sought a stay of his habeas petition pending the outcome of his § 440.10 motion. On December 17, 2018, the trial court denied petitioner's § 440.10 claim, and on March 15, 2019, his motion to stay the federal proceedings was denied in an order by Judge DeArcy Hall. On November 20, 2019, the Appellate Division denied Goodman's application for leave to appeal the December 2018 order rejecting the § 440.10 motion. *People v. Goodman*, No. 2019-11627, 2019 WL 6140646 (N.Y. App. Div. Nov. 20, 2019). Leave to appeal to the Court of Appeals was denied on January 14, 2020. *People v. Goodman*, 2020 NY Slip Op. 97068(U) (N.Y. Jan. 14, 2020). Goodman's petition was reassigned to this Court on July 27, 2021.

### B.  Analytical Framework

1. AEDPA Statute of Limitations

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs post-conviction federal habeas relief. As is relevant in this case, petitions brought under § 2254 to challenge the constitutionality of state court convictions must be filed within a one-year period

4

that begins to run "from the latest of" four specific times. *See* 28 U.S.C. § 2244(d)(1)(A). The relevant milestone is "the date on which the judgment became final by conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 244(d)(1)(A). In practical terms, finality, triggering the start of the limitations period, occurs once either the petitioner has directly appealed his conviction to the highest state court and the time to seek certiorari from the Supreme Court has expired or, having sought certiorari, the Supreme Court has either denied it, dismissed it, or has affirmed the conviction. *See Gonzales v. Thaler*, 565 U.S. 134, 150, 132 S. Ct. 641, 653, 181 L. Ed. 2d 619 (2012). Applying this rule in a state like New York, where appeal to the State's highest court is discretionary, if a petitioner does not seek certiorari from the Supreme Court, finality for AEDPA purposes would be reached 90 days after leave to appeal to the Court of Appeals is denied. *See Maynard v. Kirkpatrick*, No. 16-CV-2376, 2018 WL 3339520, at *1 (E.D.N.Y. July 6, 2018).

      2.      <u>Tolling the Statute of Limitations</u>

As is relevant here, the one-year limitations period can be tolled, or paused, in two ways. First, AEDPA provides that "[t]he one-year clock is stopped [] during the time the petitioner's properly filed application or state postconviction relief is pending." *Wood v. Milyard*, 566 U.S. 463, 468–69, 132 S. Ct. 1826, 1831, 182 L. Ed. 2d 733 (2012) (internal quotations omitted) (citing 28 U.S.C. § 2244(d)(2)). For example, a properly filed *coram nobis* petition or CPL § 440.10 motion will toll AEDPA's limitations period. *See, e.g.*, *Walker v. Graham*, 955 F. Supp. 2d 92, 101 (E.D.N.Y. 2013).

Separately, the statute of limitations may be tolled for equitable reasons. *See Holland v. Florida*, 560 U.S. 631, 645, 130 S. Ct. 2549, 2560, 177 L. Ed. 2d 130 (2010). But, such tolling is considered a drastic remedy applicable only in "rare and exceptional circumstances." *A.Q.C.*

5

*ex rel. Castillo v. United States*, 656 F.3d 135, 144 (2d Cir. 2011) (internal quotations omitted). Generally, equitable tolling requires the petitioner to show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Id.*; *see also Battles v. LaValley*, No. 13-CV-4918-ENV, 2013 WL 5652747, at *2 (E.D.N.Y. Oct. 15, 2013). The petitioner must also demonstrate a causal connection between his claimed excuse and the lateness of the filing, which is refuted by a showing that, even given the claimed excuse, the late filing could have been avoided if the petitioner had been reasonably diligent. *Valverede v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000); *see also Jenkins v. Greene*, 630 F.3d 298, 303 (2d Cir. 2010).

A petitioner's claim of "actual innocence" falls into a special subset of the jurisprudence of equitable tolling in federal habeas proceedings litigated within AEDPA's confines. Because the equity of the claim demands it, a credible "actual innocence" claim will overcome any procedural bar to federal habeas relief, and allow merits review of the constitutional claim. *See Fabers v. Lamanna*, No. 18-CV-2399, 2020 WL 1875288, at *22 (E.D.N.Y. Apr. 15, 2020), *appeal dismissed*, No. 20-1558, 2020 WL 6587523 (2d Cir. July 8, 2020). The saving grace of "actual innocence" can even overcome the running of AEDPA's statute of limitations. *See, e.g.*, *Branch v. Superintendent*, No. 11-CV-00227, 2014 WL 6737000, at *3 (E.D.N.Y. Dec. 1, 2014).

The road to "actual innocence" relief, though, is steep and rocky. "[A] claim of actual innocence must be both 'credible' and 'compelling.'" *Rivas v. Fischer*, 687 F.3d 514, 541 (2d Cir. 2012). Specifically, to be "credible," an actual innocence claim "must be supported by 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 324, 115 S. Ct. 851, 865, 130 L. Ed. 2d 808 (1995)). To make a

"compelling," then, actual innocence claim, a petitioner "must demonstrate that 'more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *Id.* (internal citations omitted).

### C. Discussion

#### 1. The Habeas Petition Is Untimely.

As the Court has previously observed, "when compliance with a limitations period is in the cross hairs, naturally, a precise recounting of the filing history [of the habeas proceeding] is essential." *Goodman*, 2017 WL 4280545, at *2. A review of the relevant files in Goodman's state court criminal proceedings and on this docket reveals clearly that, on February 5, 2016, petitioner's application for leave to appeal to New York's Court of Appeals was denied by the Second Department. *See People v Goodman*, No. 2011-02343, 2016 WL 462220 (N.Y. App. Div. Feb. 5, 2016). Since he did not seek review of his convictions by the Supreme Court of the United States, his direct appeal ended and his convictions became final, for purposes of AEDPA, 90 days later, on May 5, 2016. Accordingly, by application of arithmetic, Goodman's limitations clock started to tick on May 5, 2016, and, absent tolling, would have expired on May 5, 2017.

The docket in Goodman's habeas proceeding indicates that, on February 23, 2017, Goodman delivered his *coram nobis* motion to prison authorities to be mailed to the Second Department, *see* R. 1 at 38, an event which, by virtue of the "prison mailbox rule," activated the tolling provision of § 2244(d)(2). *See Smith v. McGinnis*, 208 F.3d 13, 16 (2d Cir. 2000) ("There … is no dispute that [petitioner's] state *coram nobis* petition, if pending within that one-year grace period, would trigger Section 2244(d)(2)'s tolling allowance."); *Fernandez v. Artuz*, 402 F.3d 111, 114 (2d Cir. 2005) (*coram nobis* motion "properly filed" on date that it was placed in prison mailbox, rather than when it was received by court). The limitations clock stopped

7

ticking on February 23, 2017, with 71 days remaining. It would start to tick again when Goodman's *coram nobis* petition had been finally determined by the state courts.

Ultimately, the Appellate Division denied Goodman's *coram nobis* application by decision and order dated September 17, 2017. *People v. Goodman*, 59 N.Y.S.3d 900 (N.Y. App. Div. 2017). Leave to appeal was denied on December 18, 2017. *People v. Goodman*, 30 N.Y.3d 1060, 94 N.E.3d 492 (N.Y. 2017). His limitations clock began to tick once again that day. With the clock ticking again on December 18, 2017, 71 days remained, and Goodman was required to file his habeas petition by February 27, 2018. But, having filed this petition on May 7, 2018, more than two months after the limitations period had expired, Goodman's petition is plainly untimely. It can be saved from dismissal only if he can establish a valid basis for equitable tolling.[4]

    2.    <u>Equitable Tolling Is Not Warranted.</u>

Goodman does not shy away from his predicament. He acknowledges that his petition is untimely, *see* R. 1 at 13, and places the fate of his habeas petition in the equitable tolling basket, *see* R. 1 at 64–65. He must now match his claims to the grounds discussed earlier that can support invocation of tolling. Common to most of these grounds is a showing by the habeas petitioner that (1) he has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way and prevented timely filing." *Castillo*, 656 F.3d at 144.

---

[4] As an aside, Goodman would later file a CPL § 440.10 motion advancing the same actual innocence argument he advances here, which was later rejected by the state court. But, it is of absolutely no moment in computing the limitations period applicable to his habeas petition. Simply, "commencing a collateral review proceeding does not 'reset' the clock" after the AEDPA statute of limitations has already run. *See Moore v. Cook*, No. 09-CV-2381-ENV, 2010 WL 2680328, at *2 (E.D.N.Y. June 30, 2010) (citing *Source v. Artuz*, 73 F. Supp. 2d 292, 294 (E.D.N.Y. 1999)).

Goodman contends that equitable tolling is warranted here because (1) until March 2015, appellate counsel failed to inform him that his conviction had been affirmed on appeal, and (2) in 2015, he was placed in administrative segregation due to an injury he sustained in prison. R. 1 at 64–65. Because both occurred long before the limitations period actually expired and because, in any event, neither of these bases constitutes an extraordinary circumstance that prevented Goodman from timely filing his petition, the Court declines to apply equitable tolling to excuse the untimeliness of Goodman's habeas petition on these grounds. *See Watson v. Smith*, 268 F. App'x 86 (2d Cir. 2008) (declining to toll AEDPA's statute of limitations where petitioner "has failed to demonstrate a causal relationship between the alleged circumstances and the lateness of his filing."); *Samo v. Keyser*, 305 F. Supp. 3d 551, 559–60 (S.D.N.Y. 2018) (appellate counsel's failure to inform petitioner of milestones not a ground for equitable tolling).[5]

3. No Credible Claim of Actual Innocence.

Grasping for the last straw, Goodman advances a far from credible actual innocence claim to clear away the AEDPA roadblock to a merits determination of his constitutional claim. Stripped to the basics, his actual innocence claim rests on purported evidence exculpating him that centers on contradicted eyewitness identification testimony.

i. The Tattoo Discrepancy

Goodman re-racks the account of his prosecution to its earliest moments when the victim gave his account of the crimes to prosecutors. *See* R. 1 at 31–32. He fixates on Nesbitt telling the prosecutor that his assailant had tattoos on his arm. It appears uncontested that Goodman has no tattoos on his arms. From this he concludes that the discrepancy in identification testimony conclusively establishes his innocence: the assailant was a man with tattoos. *See id.* However, a

---

[5] Goodman fails to explain why these events constitute an extraordinary obstacle to his compliance when neither prevented him from filing a timely petition in the first place.

9

"credible" claim of actual innocence must be supported by "new reliable evidence . . . that was not presented at trial." *Rivas*, 687 F.3d at 541 (quoting *Schlup*, 513 U.S. at 324). "New evidence" is "evidence not heard by the jury." *Id.* at 543.

On this tack, however, Goodman faces an insurmountable obstacle: there is no new evidence. In fact, the discrepancy between Nesbitt's description of the perpetrator and Goodman's actual appearance was a central feature of Goodman's defense strategy. For example, during his cross examination of Nesbitt, defense counsel emphasized the fact that Nesbitt had previously identified the perpetrator as having arm tattoos when, in fact, Goodman's arm was tattoo-free. *See* R. 1 at 132–136. Specifically, Goodman's trial counsel first asked, "do you see any tattoos on any part of my client's arms," to which Nesbitt responded "No". R. 1 at 133. Trial counsel then asked whether Nesbitt was lying when he told "the DA that the person who robbed [Nesbitt] without the gun had tattoos," to which Nesbitt responded, "Yes". *Id.* Finally, Goodman's arms were presented to the jury for observation. *See* R. 2 at 85–86. Indeed, unhelpfully to Goodman on this petition, the trial court ultimately directed defense counsel to move on as he had "gone through [the issue] a number of times" and had "made [his] point".

In short, because the tattoo discrepancy was presented to and heard by the jury that convicted Goodman, it does not constitute the kind of new evidence that a credible actual innocence claim requires. *E.g. Bishop v. Lilley*, No. 17-CV-7625, 2018 WL 8579821, at *6 (S.D.N.Y. Oct. 12, 2018), *report and recommendation adopted*, No. 17-CV-7625, 2019 WL 1417124 (S.D.N.Y. Mar. 28, 2019). The so-called "tattoo discrepancy", then, offers no support for Goodman's actual innocence claim.

10

> ii. Alibi Witness Affidavits

Goodman also tries to alibi his way to "actual innocence". In advancing this argument, his petition does offer "new evidence" that, if found credible, could support his claim. It takes the form of two affidavits, one from Latoya Talbert and the other from Christopher Crossman. Both are friends of Goodman and both affidavits tell the same tale. In sum and substance, both affidavits swear that on August 22, 2009, the evening before the crimes were committed, Goodman and Crossman went to play cards at Talbert's mother's house and played cards from 10:00 PM on, and that Goodman remained at that house until around 10:00 AM the following morning, being roused awake by Goodman's mother because he was late for church. *See* R. 13-1 at 8–10.

Since an alibi defense was never presented at Goodman's trial, the two affidavits constitute new evidence. But, that is where consideration starts, not where it ends. To make out a claim of actual innocence, a petitioner must proffer not only new evidence, but new evidence that is credible. *See Rivas*, 687 F.3d at 541. It is at this point that Goodman's argument falls fatally flat. For starters, without any accounting for the delay, the affidavits materialize more than eight years after the crimes.

Beyond two friends offering precisely the same alibi after an eight-year hiatus, neither affidavit manifests any indicia of detail, or outside corroboration, or reliability. Moreover, neither Talbert nor Crossman explain why they waited more than eight years, while an "innocent" Goodman wallowed in jail, before they came forward. *See McQuiggin v. Perkins*, 569 U.S. 383, 399, 133 S. Ct. 1924, 1935, 185 L. Ed. 2d 1019 (2013) ("Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing."). All that the affidavits show is that Talbert and Crossman are Goodman's friends,

11

making them interested witnesses and providing reason to find their testimony unreliable. *Desrosiers v. Phillips*, No. 05-CV-2941, 2006 WL 2092481, at *8 (E.D.N.Y. July 27, 2006) (report and recommendation) ("Generally . . . exculpatory affidavits [from friends] do not establish actual innocence, as they are not reliable.").

At any rate, even if the affidavits were deemed credible, Goodman has not made out a compelling claim of actual innocence based on the alibi witness affidavits. *See Rivas*, 687 F.3d at 541 (a claim of actual innocence "must be both 'credible' and 'compelling'") (quoting *House v. Bell*, 547 U.S. 518, 521, 538, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006)). New evidence that merely conflicts with the evidence presented at trial is insufficient to demonstrate that "no reasonable juror", presented with this new evidence "would find [the petitioner] guilty beyond a reasonable doubt". *Fabers*, 2020 WL 1875288, at *23 (citing *Rivas*, 687 F.3d at 541) (internal quotation marks and citation omitted); s*ee also DiMattina v. United States*, 949 F. Supp. 2d 387, 421 (E.D.N.Y. 2013) ("Newly discovered affidavits and phone records offering what is claimed to be a conflicting narrative to the one presented by [the victim] at trial do not sufficiently support a finding that the consistent testimony of [the victim and other corroborating witnesses] should be disregarded and that [the petitioner] is actually innocent."); *Rosario v. Ercole*, 582 F. Supp. 2d 541, 559–60 (S.D.N.Y. 2008) (newly-discovered alibi testimony not credible because it created "a credibility contest" between the prosecution's case at trial and the newly-discovered evidence).

Put bluntly, the tale spun by the alibi witnesses is no match for the People's case. The evidence presented by the prosecution at trial included eye-witness testimony from Nesbitt, the victim, and Overton, a longtime acquaintance of Goodman. Nesbitt testified that his entire interaction with Goodman lasted close to two hours, R. 3 at 9, that while they were seated at a

park bench Goodman was about an arms-length away from Nesbitt, and that because the streetlights were on and the sun was coming up, the lighting conditions were "[p]retty clear," R. 2 at 35.  Overton testified that as he and Nesbitt were walking, he recognized Goodman, with whom he had attended elementary school, and that he was seated next to Goodman when the group sat down at the park bench. R. 3 at 16–25.  In short, this is not a case where the prosecution's evidence was weak; to the contrary, reliable eye-witness testimony tied Goodman to the crimes.  *Cf. Lopez v. Miller*, 915 F. Supp. 2d 373, 412 (E.D.N.Y. 2013) (describing weak eyewitness testimony and noting that the case was "a toss-up at best.").  Accordingly, because the alibi witness affidavits Goodman submits are woefully insufficient to make his claim compelling, Goodman's actual innocence claim fails.

      Consequently, in the absence of a viable basis for equitable tolling or a compelling claim of actual innocence, Goodman's petition is time-barred.  It is, as AEDPA demands, dismissed on that ground.

Conclusion

For the foregoing reasons, Goodman's application for a writ of habeas corpus is denied, and his petition is dismissed.

Since petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue. See 28 U.S.C. § 2253(c)(2).

The Court certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this Memorandum and Order would not be taken in good faith and, therefore, *in forma pauperis* status is denied for the purpose of any appeal. See *Coppedge v. United States*, 369 U.S. 438, 444–45, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962).

The Clerk of Court is directed to mail a copy of this Memorandum and Order to petitioner, to enter judgment accordingly and to close this case.

So Ordered.

Dated: Brooklyn, New York

      October 12, 2021

                                                                  /s/ENV

                                                                  ERIC N. VITALIANO

                                                                  United States District Judge